## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHELLE GRIMMETT, on her own behalf and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 24-CV-5903 |
| vs. | |
| DMM SOLUTIONS, INC., and DOES 1-100, Whose Names Are Currently Unknown, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff Michelle Grimmett ("Plaintiff"), by and through counsel, on her own behalf and on behalf of all others similarly situated, and for her cause of action against Defendant DMM Solutions, Inc. ("DMM") and Defendant Does 1-100 ("Does 1-100") (collectively, "Defendants") states and alleges as follows:

1.    Plaintiff brings this action on her own behalf and on behalf of all others similarly situated against Defendants in connection with DMM's scheme to use websites disguised as providing legitimate dating services to mercilessly extract money from users hoping for romance.

2.    Traditionally, dating websites use a subscription model, in which users interested in meeting others pay a regular flat fee (*i.e.*, monthly, annual, etc.) for access to a website that allows them to interact with other users that are likewise searching for romance.

3.    DMM operates and controls a group of dating websites that turn that model on its head. While DMM's model does require a monthly fee for site access, DMM utilizes a "pay for

1

engagement" model, where users buy credits, which operate as currency to pay for transactions made on DMM's dating websites. Credits are necessary for users for any and all engagement with certain members on DMM's dating websites, including:

      a.  Sending messages;

      b.  Sending images;

      c.  Opening images;

      d.  Participating in chat sessions;

      e.  Participating in video chat sessions; and

      f.  Sending stickers.

4.     Requiring credits to pay for its site transactions might be an acceptable approach, if DMM's websites were legitimate dating sites. They are not. Instead, while marketed as "dating sites," DMM's websites actually trick users into spending credits to interact with fake profiles posing as love interests.  Put another way, users on DMM's dating websites essentially – and unwittingly – pay significant sums of money believing that they are engaging in actual discussions with others legitimately interested in romance.  Instead, DMM's dating websites are populated by scores of fake profiles of popular members ("Popular Members") who exist solely to engage in phony interactions with users, thus churning users' credits.  As users are not aware of the fraudulent nature of DMM's dating websites and instead believe they are engaged in legitimate romantic connections, they spend money and suffer damages by purchasing credits to use to engage with these numerous fake profiles in a despicable scheme created and maintained by Defendants' employees, agents, and/or co-conspirators.

5.     Plaintiff was victimized by Defendants' scheme. Believing this was in furtherance of a legitimate romantic opportunity, Plaintiff paid tens of thousands of dollars for credits to use

on DMM's dating website.  As a direct and proximate result of Defendants' conduct, Plaintiff has sustained significant financial harm and damages.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff is an individual who is a citizen of the State of Missouri and resides in St. Louis County, Missouri.  Plaintiff was a member of DMM's website, "Dating.com" since at least the fall of 2020 and has spent in excess of $20,000 to purchase credits to communicate with Popular Members.  While Plaintiff believed these communications were sincere efforts to engage with the Popular Members romantically, in fact, she was communicating with catfish accounts that existed solely to incentivize her to purchase and spend credits, in furtherance of the Defendants' scam described herein.

7.      DMM is a corporation organized in the State of New York, with its principal place of business located at 416 East 85th Street, 5A, New York, NY 10028.  DMM describes itself as "an online website provision and global network user acquisition hub … provid[ing] services for dating sites…"[1]  These are the platforms for which DMM provides services, and that it identifies as its "projects":

    a.   Amolatina;

    b.   Dating.com;

    c.   YourTravelMates;

    d.   AnastasiaDate International;

    e.   ArabianDate: Chat&Date;

    f.   Cherish; and

---

[1] https://www.dmmsolutionsinc.com/aboutus (last accessed July 8, 2024).

      g.  FlirtWith: Live Streams.[2]

8.     Does 1-100 are co-conspirators whose names are currently unknown and who play the role of Popular Members[3] on DMM's dating websites and receive benefits from DMM in connection with their participation.

9.     At all relevant times herein, Defendants were working in concert in furtherance of the wrongful conduct described herein, thus, making them jointly and severally liable for the claims asserted herein.

10.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 because Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that Plaintiff brings this case as a putative class action, Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $5,000,000 in the aggregate. Furthermore, this Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law unjust enrichment claims, which arise out of the same operative facts and form a part of the same case or controversy as the RICO claims.

11.    Venue is properly vested in this District pursuant to 28 U.S.C. § 1391 because DMM maintains its principal place of business in this District, and the conduct at issue emanated from this District.

## CLASS ACTION ALLEGATIONS

12.    Plaintiff brings this action and seeks to certify and maintain it as a class action

---

[2] https://www.dmmsolutionsinc.com/stockists (last accessed July 8, 2024).
[3] These individuals or entities are referred to and/or known as Popular Members on DMM's website, Dating.com. Upon information and belief, individuals or entities who use the name Popular Members or other similar nomenclature on DMM's other dating sites or platforms operate in a substantially identical way as described herein.

under Fed. R. Civ. P. 23, individually and on behalf of the following class ("Class"):

> All individuals in the United States who have purchased and used credits from Defendant DMM to communicate with Popular Members (and/or related members with affiliate relationships with DMM) on Defendant DMM's dating websites.

> Excluded from the Class are: (a) Defendants and any entities in which Defendants have a controlling interest; (b) any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants; (c) all current employees of Defendants; (d) the Judge(s) to whom this case or any transferred case is assigned and any member of the Judge(s)' immediate family and any other judicial officer assigned to this case or any transferred case; (e) all governmental entities; and (f) anyone who makes a timely election to be excluded from the Class.

13.    Plaintiff also brings this action and seeks to certify and maintain it as a class action under Fed. R. Civ. P. 23, individually and on behalf of the following subclass ("Subclass"):

> All individuals in Missouri who have purchased and used credits from Defendant DMM to communicate with Popular Members (and/or related members with affiliate relationships with DMM) on Defendant DMM's dating websites.

> Excluded from the Subclass are: (a) Defendants and any entities in which Defendants have a controlling interest; (b) any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants; (c) all current employees of Defendants; (d) the Judge(s) to whom this case or any transferred case is assigned, and any member of the Judge(s)' immediate family and any other judicial officer assigned to this case or any transferred case; (e) all governmental entities; and (f) anyone who makes a timely election to be excluded from the Subclass.

14.    Plaintiff reserves the right to modify or amend the definitions of the proposed Class and Subclass, and/or to add other subclasses (collectively, "the Class" as used herein), if necessary, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

15.     This case is properly brought as a class action under Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and (c)(4), and all requirements therein are met for the reasons set forth herein.

16.     The claims of all Class members derive directly from a single course of conduct by Defendants, who have engaged and continue to engage in uniform and standardized conduct toward the Class members. Defendants do not differentiate, in degree of care or candor, in their actions or inactions, or the content of their statements or omissions, among individual Class members. Accordingly, Plaintiff brings this lawsuit as a class action on her own behalf and on behalf of all individuals similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these provisions.

17.     Certification of Plaintiff's claims is appropriate because she can prove the elements of her claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

18.     **Numerosity - Fed. R. Civ. P. 23(a)(1).** The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed the Class includes many thousands of members.  The numerosity requirement is, therefore, satisfied. Undoubtedly, individual joinder in this case is impracticable. More than 1,000 Class members are sufficient to satisfy numerosity under Fed. R. Civ. P. 23(a)(1).

19.     **Ascertainability.**  The Class is ascertainable because its members can be readily identified by using business records and other information kept by Defendants in the usual course of business and within their control or through Plaintiff and the Class members themselves. Plaintiff anticipates providing appropriate notice to the Class to be approved by the

Court after Class certification or pursuant to Court order.

20.     **Commonality and Predominance - Fed. R. Civ. P. 23(a)(2) and (b)(3).** There are several questions of law and fact common to the claims of Plaintiff and the members of the Class. All of the members of the Class's claims are based upon the same facts and circumstances. Fed. R. Civ. P. 23(a)(3). The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members of the Class. The resolution of common questions in this case will resolve the claims of both Plaintiff and the Class. Common questions include, but are not limited to, the following:

    a.  Whether Defendants unfairly, unethically, unlawfully, falsely, deceptively, misleadingly, unconscionably, and/or confusingly misrepresented the nature of the websites and dating services for members of the Class;

    b.  The nature of the relationship between DMM and the Popular Members;

    c.  The extent to which Popular Members are compensated for their participation in their arrangement with DMM;

    d.  Whether Defendants are aware of the existence of, and/or actively participate in, the creation and maintenance of fake dating profiles;

    e.  Whether Popular Members intentionally target members of the Class to generate paid engagement for the enrichment of Popular Members and DMM;

    f.   Whether DMM and the Popular Members are engaged in an "enterprise," as that term is used by 18 U.S.C. § 1961(4);

    g.  Whether Defendants otherwise have engaged in unfair, unlawful, fraudulent, unethical, unconscionable, and/or deceptive trade practices;

    h.  Whether Defendants had a duty to provide accurate information about the nature

of the websites and dating services to Class members;

i.   Whether Defendants violated the applicable statutes identified herein;

j.   Whether Defendants concealed material facts in the websites' advertising materials and/or failed to adequately disclose material facts;

k.   Whether Plaintiff and the Class are entitled to actual, compensatory, nominal, statutory, and/or punitive damages;

l.   Whether Plaintiff and the Class are entitled to injunctive, declaratory relief, or other equitable relief; and

m.  Whether Plaintiff and the Class are entitled to reasonable attorneys' fees and costs.

21.    **Typicality - Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of the Class.  The claims of Plaintiff and the respective Class members are based on the same legal theories and arise from the same unlawful and willful conduct of Defendants, resulting in the same injury to Plaintiff and the respective Class.  Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct and were damaged in the same way. Plaintiff's interests coincide with, and are not antagonistic to, those of the other Class members. Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

22.    **Adequacy - Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate Class representative because she has retained counsel competent and experienced in complex class action litigation; neither Plaintiff nor her counsel have any interests adverse to those of the other members of the Class.  Plaintiff is knowledgeable about the subject matter of this action and will assist counsel to vigorously prosecute this litigation and has or can acquire adequate financial resources to assure that the interests of the Class will not be harmed.  The interests of

the members of Class will be fairly and adequately protected by Plaintiff and her counsel.  As such, Plaintiff meets the adequacy requirement.

23.    **Superiority - Fed. R. Civ. P. 23(b)(3).** A class action is superior to all other available means for the fair and efficient adjudication of this matter. The injury suffered by each member of the Class, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if members of the Class themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

24.    **Policies Generally Applicable to the Class - Fed. R. Civ. P. 23(b)(2)**. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply to and affect the members of the Class uniformly, and Plaintiff's challenge of those practices hinge on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

25.    **Injunctive and Declaratory Relief is Appropriate - Fed. R. Civ. P. 23(b)(1).** Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a

whole.

26.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class.

27.     The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

28.     **Certification of Particular Issues. Fed. R. Civ. P. 23(c)(4).** Issue certification is also appropriate with respect to any or all of the common issues identified herein.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

29.     Defendants have manipulated the framework of a legitimate dating site to create a fantasy world where users unknowingly pay money to engage in artificial relationships with DMM-affiliated persons, the sole goal of which is to induce users to purchase and spend credits. DMM's sites are marketed as dating sites; the true purpose of DMM's sites, however, is to enable DMM and its Popular Members to fraudulently line their pockets and be enriched at the expense of unsuspecting/unwitting Class members.

30.     The Defendants' scam works as follows: users are asked to sign up and create a profile. The process is simple, and only minimal information is required: name, email address, location and birthday.



31.    Users then may, but are not required to, add some information about themselves, about their ideal mate, their interests, and to add a photo, all of which is intended to lead users to believe that they are using a real dating site.









32.     After moving through these screens, users land on the home page, and the scam starts immediately. Within seconds of submitting their profile, users begin *receiving* messages from interested would-be suitors on the right side of the page—all of whom are Popular Members.



Samples of messages can be seen below.







33.    The term Popular Members is a special designation of users within DMM's pool of users. They are differentiated from regular users in the following important respects:

a.  They may send messages to other members free of charge, while Regular Members must use credits to interact with Popular Members; and

b.   They are very, very active.

34.    Additionally, and perhaps most critically, Popular Members are not, in fact, actual people who are interested in making connections with other legitimate members. Instead, they are fake "catfish" profiles that are set up to use photographs of paid models who are operated by members of the enterprise described herein, with the sole goal and purpose of enticing users to buy credits to engage with them.

35.    A "catfish," as defined by Merriam-Webster, is "a person who sets up a false personal profile on a social networking site for fraudulent or deceptive purposes."[4] Catfishing is a known problem on internet dating sites and the internet in general. Most dating sites make an effort to actively police catfishing activity in an attempt to maintain a safe, effective platform for their users. DMM, on the other hand, conspires with and incentivizes those who maintain catfish accounts to target the users of its various dating platforms and/or actively maintains such accounts through its agents, servants, and employees.

36.    DMM credits are expensive. When first signing up, users are presented with three membership options: 150 credits for $19.99 ($.013/credit) (which is promotional pricing and is normally $60, or $.30/credit), 600 credits for $150 ($.025/credit), or 1,500 credits for $300 ($.20/credit).  In addition, the engagement services pricing is costly.  For example, sending a single photograph can cost a user as much as $4.50, and a 10-minute video chat can cost a

---

[4] https://www.merriam-webster.com/dictionary/catfish (last accessed on July 8, 2024).

user $18. As a result, users quickly expend all of their credits and must purchase additional credits to continue their engagements with Popular Members.

37.     Using credits to communicate with Popular Members adds up quickly.  Example credit charges are as follows:

     a.  Basic Chat costs one credit per minute;

     b.  One-Way Video Chat costs four credits per minute;

     c.  Two-Way Video Chat costs six credits per minute;

     d.  Offline Message sending costs one credit per message (160 symbol limit);

     e.  Mobile App Message sending costs one credit per message (160 symbol limit);

     f.  Emails cost 10 credits per email;

     g.  Sending/viewing photos or videos costs 15 credits per photo or video;

     h.  Sending stickers costs five credits per sticker sent;

     i.  Sending animated smiles costs one credit per smile;

     j.  Sending gifts in Live Video costs from five to 1,000 credits per gift;

     k.  Sending personal messages in Live Video costs one credit per personal message;

     l.  Viewing one video in a profile costs 10 credits per view; and

     m.  Let's Mingle costs five credits per use.

38.     Upon information and belief, Popular Members also differ from regular members in that they are incentivized by DMM to engage with users.

39.     Discovery will reveal the exact remuneration that Popular Members receive for engaging with users, but it is clear that there is a financial benefit for Popular Members to maximize their engagement with paying members.

40.     The incentive for Popular Members to work with DMM is obvious: a significant

portion of DMM's revenue is tied to Class members buying credits to use to interact with Popular Members. The more engagement Popular Members generate with users, the more revenue DMM receives.  In essence, (i) DMM charges users for the cost of credits, (ii) Popular Members induce users to churn through users' credits, and (iii) the DMM/Popular User enterprise (the "Enterprise") share the spoils.

41.    Defendants' conduct is characterized by fraud and is specifically intended to be shielded from Plaintiff and the members of the Class; thus, the statute of limitations should be tolled where applicable.

42.    Additionally, DMM's agreements with Plaintiff and the Class were procured by fraud. As detailed herein, Plaintiff and the Class were (and are) induced to enter into an agreement to join a dating site that is not, in fact, a dating site. The fraudulent nature of the arrangement so permeates the transaction as to render it a different type of transaction than Plaintiff and the Class members thought they were entering into. As such, Plaintiff and the Class would not have entered into those agreements had they known the true nature of DMM's sites and operations. Thus, these contracts are void *ab initio*, and Defendants may not rely upon any contractual language contained therein in defense of this matter.

43.    Plaintiff incorporates by reference the matters set forth in its RICO Case Statement filed contemporaneously herewith as if fully set forth herein.

## COUNT I – RICO

## 18 U.S.C.  § 1961, *et seq.*

44.    Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

45.    Plaintiff is a "person" as that term is defined in 18 U.S.C.  § 1961(3) in that she

is an individual capable of holding a legal or beneficial interest in property.

46.    DMM is a "person" as that term is defined in 18 U.S.C. § 1961(3) in that it is an entity capable of holding a legal or beneficial interest in property.

47.    The Does 1-100 are "persons" as that term is defined in 18 U.S.C. § 1961(3) in that they are individuals capable of holding a legal or beneficial interest in property.

48.    DMM combined with the Doe Defendants to form an "enterprise," as that term is defined by 18 U.S.C. § 1961(4) (the "Enterprise"). More specifically, Defendants have associated in fact to facilitate the scheme described herein, which is designed to create a shared pool of revenue that is separate and distinct from the revenue generated by basic site access and use.

49.    Defendants have engaged in racketeering activity as that term is defined by 18 U.S.C. § 1961(1). More specifically, Defendants have transmitted, continue to transmit, and will hereafter transmit, communications in furtherance of their fraudulent scheme and/or Enterprise over interstate and, in some instances, foreign wire systems, in violation of 18 U.S.C. § 1343.

50.    The wire transmissions at issue herein are relayed from Popular Members on DMM's dating platforms and sent to Plaintiff and members of the Class. The specific timing of the transmissions as to Class members will be revealed during discovery, but Plaintiff's situation is demonstrative. As to Plaintiff, these wire transmissions included hundreds of messages between "Valerio" and Plaintiff, sent over the course of more than a year, starting in approximately the fall of 2020. The messages at issue were fraudulent in that they:

      a.    Were not from the person depicted in the profile photos;

      b.    Were from an unidentified member of the Enterprise who had no legitimate

romantic interest in Plaintiff;

    c.   Were specifically and solely intended to generate revenue for the Enterprise; and

    d.   Were otherwise deceptive and sent with a malicious motive.

51.    Plaintiff was able to identify the person in the photographs used by "Valerio," and was advised that "person" had been contacted by a website – which, upon information and belief, was one of DMM's websites – and was offered $100 for photos to be used in an advertising campaign. The person in "Valerio's" photos did not have a profile on any DMM website, had not previously been interacting with Plaintiff, and was completely unaware that his photographs were not being used for advertising, but were instead being used to catfish users of DMM's websites.

52.    Defendants' conduct as described herein makes use of interstate and foreign wires and affects interstate commerce.

53.    Defendants have engaged in a "pattern of racketeering activity" as that term is defined by 18 U.S.C. § 1961(5). More specifically, for as long as DMM has included Popular Members in its user bases, Defendants have engaged in an open-ended, systematic pattern of fraud, which is continuous, ongoing, persistent, and comprised of hundreds of distinct fraudulent transfers of data which constitute predicate acts in furtherance of their conspiracy and Enterprise. These acts as described herein have the same or similar purposes, results, participants, types of victims, methods of commission, and are otherwise interrelated by distinguishing characteristics as will be demonstrated through discovery and are not isolated events. If not stopped, Defendants' ongoing criminal conduct as described herein will continue unabated.

54.    Defendants' conduct as described herein is in violation of 18 U.S.C. § 1962(a), (c), and/or (d).

20

55.     As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962 and fraudulent use of interstate and foreign wires, Plaintiff has suffered significant financial injury and loss of her property.

56.     The Enterprise is an operation engaged in activities that affect interstate commerce. Defendants are employed by or associated with the Enterprise, and all participants contribute to, facilitate the operation of, and derive benefit from the Enterprise.

57.     Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff as set forth herein.

58.     Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple, related, and systematic acts of wire fraud.

59.     The acts of wire fraud identified herein constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

60.     Defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(a), (c), and/or (d).

61.     Defendants' conduct is marked by a corrupt motive and a conscious disregard of the rights of Plaintiff and the Class.

62.     As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business and property in that they have spent money to buy worthless credits that they would not have purchased but for Defendants' fraudulent conduct discussed herein.

## COUNT II

## <u>VIOLATION OF N.Y. GEN. BUS. LAW § 349</u>

63.    Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

64.    As described more fully herein, Defendants have engaged in a course of conduct with respect to the marketing and operation of their services that contains false and/or misleading statements of fact, or omissions of critical facts, which were directed to Plaintiff and members of the Class.

65.    These false and/or misleading statements, or omissions of material facts, include the following:

   a.  Suggesting in their advertising that DMM's websites were, in fact, dating sites where users would primarily communicate with other eligible users; and

   b.  Failing to disclose that Popular Members, which make up a substantial portion of the users on DMM's sites and are its most active users, were, in fact, affiliates of DMM who were incentivized to generate false interactions with paying users.

66.    The false and misleading statements and omissions described herein are material and intended to have an impact on whether or not members of the Class sign up to use the service and make purchases with the sites at all, and do, in fact, have such an impact.

67.    The false and misleading statements and omissions described herein actually deceive or have the tendency to deceive customers, Plaintiff, and the Class members and have, in fact, resulted in their purchasing of credits from DMM's websites.

68.    Defendants' conduct as described herein constitutes a violation of N.Y. Gen. Bus. Law § 349.

69.     As a direct and proximate result of Defendants' violation and false and misleading statements and omissions described herein, Plaintiff and the Class have sustained monetary damages and are likewise entitled to recover from Defendants all profits, gains, and advantages obtained by them stemming from this improper conduct.

70.     As a direct and proximate result of Defendants' violations and false and misleading statements and omissions described herein, Plaintiff and the Class have additionally sustained other irreparable injury for which there is no adequate remedy at law. Accordingly, Plaintiff and the Class are entitled to equitable relief enjoining Defendants from engaging in the conduct described herein, and other similarly deceptive and improper conduct, mandating the cessation and reversal of all existing false advertising.

**COUNT III**

**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT**

**(As to a Subclass on Behalf of Plaintiff and Missouri Consumers)**

71.     Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

72.     The services provided by Defendants to Plaintiff and the Class constitute "merchandise," and the purchase of the services was a "sale" in "trade or commerce" as those terms are used in R.S.Mo. § 407.010, *et seq.*

73.     Defendants' conduct as described herein constitutes the use of "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement" of the services and is thereby a violation of the Missouri Merchandising Practices Act ("MMPA"), specifically R.S.Mo. § 407.020.

23

74.    The representations and omissions at issue as detailed herein have to do with the core nature of Defendants' offerings. DMM was fully aware that its Popular Members had no legitimate interest in romantic relationships with users and were not the people they represented themselves to be and had a duty to Plaintiff and the Subclass to disclose these material facts.

75.    As a direct and proximate result of Defendants' conduct in violation of the MMPA as described herein, Plaintiff has sustained damages in an amount to be proven at trial.

76.    Defendants' conduct, as described herein, was marked by greed, an evil motive, and specifically deprived Plaintiff and Class members of their rights, thus justifying the imposition of punitive damages and an award of attorneys' fees and costs.

## COUNT IV

## UNJUST ENRICHMENT

77.    Plaintiff re-alleges and incorporates by reference all preceding allegations as though fully set forth herein.

78.    Plaintiff and Class members conferred a benefit on Defendants by purchasing credits for use on DMM's websites for use interacting with the Does 1-100.

79.    DMM voluntarily accepted and retained the benefit conferred by Plaintiff and Class members in the form of profits made from selling these credits.

80.    Does 1-100 likewise voluntarily accepted and retained the benefit conferred by Plaintiff and Class members in that, upon information and belief, they enjoyed a share of the volume of revenue spent by Plaintiff and the Class to interact with them.

81.    The benefits that Defendants received and retained are unjust, and inequity has resulted.

82.    Defendants knowingly accepted the unjust benefits of their misconduct.

83.     It is inequitable and unconscionable for Defendants to retain those unjust benefits, which rightfully belong to Plaintiff and the Class Members.

84.     As a direct and proximate result of Defendants' misconduct, Plaintiff and the Class have been deprived of their money, and those amounts must in equity be disgorged and returned to Plaintiff and the Class Members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this case be certified and maintained as a class action pursuant to one or more of the proposed Classes, as they may be modified or amended, and respectfully requests that this Court:

A.     Determine that this Complaint and the claims alleged herein be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.     Appoint Plaintiff as the representative of the Classes and her counsel as Class counsel;

C.     Award compensatory damages to Plaintiff and all other Class members;

D.     Award Plaintiff and Class members such additional damages, over and above the amount of their actual damages, which are authorized and warranted by law, including, but not limited to, statutory treble damages and other exemplary damages as may be available;

E.     Grant restitution to Plaintiff and Class members and require Defendants to disgorge their inequitable gains;

F.     Grant appropriate injunctive and/or declaratory relief as the evidence may show;

G.     Award Plaintiff and Class members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

H.    Award such other relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  August 2, 2024                                    MILLER SHAH LLP,

                                                BY: _____.

                                                Laurie Rubinow
                                                James C. Shah
                                                Anna K. D'Agostino
                                                225 Broadway, Suite 1830
                                                New York, NY 10007
                                                Tel: 866-540-5505
                                                Fax:  866-300-7367
                                                lrubinow@millershah.com
                                                jcshah@millershah.com
                                                akdagostino@millershah.com

                                                James J. Rosemergy
                                                CAREY, DANIS & LOWE
                                                8235 Forsyth, Suite 1100
                                                St. Louis, MO 63105
                                                Tele: 314-725-7700
                                                Direct: 314-678-1064
                                                Fax: 314-721-0905
                                                jrosemergy@careydanis.com

                                                Steven A. Schwartz
                                                Zachary P. Beatty
                                                CHIMICLES SCHWARTZ
                                                KRINER
                                                & DONALDSON-SMITH LLP
                                                361 W. Lancaster Ave.
                                                Haverford, PA 19041
                                                Telephone: (610) 642-8500
                                                Facsimile: (610) 649-3633
                                                steveschwartz@chimicles.com
                                                ZPB@chimicles.com
                                                akdagostino@millershah.com
                                                lrubinow@millershah.com